UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TRIPRO CONSULTING, LLC,

    Plaintiff,

v.                                                                                 Case No: 6:23-cv-568-JSS-DCI

CACI, INC. – FEDERAL,

    Defendant.
_____/

**<u>ORDER</u>**

      Plaintiff, Tripro Consulting, LLC, initiated this action against Defendant, CACI, Inc. – Federal, alleging breach of contract and a statutory violation. (Dkt. 1.) Pursuant to the parties' agreement, the court granted Defendant summary judgment as to the statutory violation. (*See* Dkt. 31 at 5, 8.) The court held a three-day bench trial from January 21 to 23, 2025, on the remaining breach of contract claim. (*See* Dkts. 77–79.) Upon consideration of the evidence, the court sets forth its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52 and directs the Clerk to enter judgment in favor of Defendant under Federal Rule of Civil Procedure 58.[1]

---

[1] To the extent that any findings of fact may constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law may constitute findings of fact, they are adopted as such.

## BACKGROUND

Plaintiff entered into a subcontract with Defendant to provide cybersecurity services to the United States government. (*See* Dkt. 76-1.) Later, after being informed by the government that Plaintiff had lost its security clearance, Defendant notified Plaintiff that it was terminating the contract "based upon customer direction." (Dkt. 76-2 at 1.) Plaintiff initiated this action alleging that Defendant "materially breached the [subc]ontract by terminating it without a proper basis." (Dkt. 1 ¶ 15.)

At trial, the court heard testimony from five witnesses. (*See* Dkts. 71, 72, 74.) Each party called Robert Furstoss as a witness. (*See id.*) Plaintiff also called as witnesses Joseph Jessop, Uday Shenvi, and Brian McElroy. (*See* Dkts. 71, 72.) Defendant also called Jeremy Klem. (*See* Dkts. 72, 74.) The following exhibits were admitted into evidence: Plaintiff's Exhibits 1 through 6, 10, 11, 14 through 19, 21, 28, 29, 34, and 37, and Defendant's Exhibits 1 through 15, 17, 18, 20 through 38, 43, 46, and 49. (Dkts. 75, 76.) Following the trial, the parties submitted proposed findings of fact and conclusions of law. (Dkts. 85, 88.) Plaintiff argues that "the breach is clear" because Defendant terminated the subcontract based on the erroneous belief that Plaintiff's security clearance had lapsed. (Dkt. 88 at 6, 9.) Defendant asserts to the contrary that it properly terminated the subcontract at the government's direction after being informed that Plaintiff's managing member, Brian McElroy, had lost the requisite security clearance. (Dkt 85 at 6–11.)

## FINDINGS OF FACT

The court makes the following findings of fact regarding the execution and termination of the parties' contract. In doing so, the court generally credits the witnesses' statements at trial.

Defendant is a federal contractor that provides products and services to the United States government. (Dkt. 77 at 50.) Plaintiff is a subcontractor that worked to protect government communications by certifying cryptographic products for government use. (Dkt. 78 at 108.) Defendant entered into a contract with the government to perform cybersecurity work for the Command, Control, Computers, Communications, Cyber, Intelligence, Surveillance, and Research (C5ISR) Center, among other government entities. (*See* Dkt. 76-7 at 1–2; Dkt. 77 at 54.) To fulfill its obligations under that contract—the prime contract—Defendant executed a subcontract with Plaintiff under which Plaintiff would perform work in support of the prime contract. (*See* Dkt. 76-1; Dkt. 77 at 55.) The subcontract included the following termination provision:

> Item 24 – Termination for Convenience
>
> [Defendant] may terminate the [subcontract] in whole or in part if it is determined that a termination is in [Defendant]'s and/or the [g]overnment's best interests or if the [g]overnment exercises its termination for convenience rights under the [p]rime [c]ontract as defined in [Federal Acquisition Regulation (FAR)] 52.249-6. [Defendant] may terminate this [subcontract] by issuing a written notice of termination to [Plaintiff]. The written notice will include the termination effective date, justification[,] and actions to be taken by [Plaintiff].

> In the event that [Defendant] terminates this [subcontract] pursuant to [g]overnment direction, [Plaintiff]'s recovery of termination costs shall be limited to the extent that [Defendant] is able to recover such costs from the [g]overnment.

(Dkt. 76-1 at 14.) The subcontract also incorporated by reference a number of provisions of the FAR, including 52.204-2, which sets forth general security requirements and, among other things, requires subcontractors to comply with the National Industrial Security Program Operating Manual (NISPOM), 32 C.F.R. § 117. (Dkt. 76-1 at 34.)

Robert Furstoss, Defendant's deputy program manager, testified that rather than seek bids from subcontractors, it selected Plaintiff specifically because Plaintiff was already performing related work for C5ISR under another contract. (*Id.* at 100–01.) Defendant submitted a Single/Sole Source Justification document to the government explaining that "[n]o other [subcontractors] were considered as [Plaintiff] ha[d] been successfully supporting the [communication security] projects under multiple contracts for several years," and noting that Plaintiff was "required to transition from another [Cyber Security and Information Assurance] task order to [Defendant]." (Dkt. 76-8 at 1.) Furstoss testified that this practice was standard where a contractor sought to engage and transition a subcontractor from one project to another. (Dkt. 77 at 101.)

Given the sensitive nature of the work involved under the prime contract, all subcontractors were required to have, at a minimum, secret security clearance, a clearance level higher than confidential but lower than top secret. (Dkt. 76-1 at 45;

Dkt. 77 at 82–83.) The subcontract also stated that "[i]ndividual [t]ask [o]rders may require higher level security clearances." (Dkt. 76-1 at 45.) A separate statement of work was prepared that "establishe[d] the requirements for [s]ub[c]ontractor-provided services." (Dkt. 76-7 at 2.) That document stated that "[t]he security requirements for this effort are defined in the DD Form 254." (*Id.* at 41.) That form, in turn, stated that the "level of facility security clearance . . . required" to work on the contract was top secret and that individual contractors required sensitive compartmented information (SCI) access. (Dkt. 76-39 at 1–2 (emphasis omitted).) Jeremy Klem, Defendant's senior security manager assigned to Plaintiff's contract, explained that Plaintiff was therefore required to have a top secret facility clearance and any individuals who sought to perform work through Plaintiff—including McElroy—to have SCI access. (Dkt. 78 at 181, 183, 185–86.) The statement of work also noted that Jean Goodwin, a contract monitor who oversaw security policies and procedures for the government as they related to the prime contract, (*see* Dkt. 78 at 184, 189–90, 237), would ensure Plaintiff's compliance with the relevant security requirements. (Dkt. 76-7 at 41; *see also* Dkt. 77 at 90 (Furstoss's testimony that "[Jean Goodwin] is the C5ISR security officer, so she[ is] in charge of ensuring the active security clearance levels of companies supporting C5ISR").)

    Klem testified that Plaintiff was unique from an organizational standpoint in that McElroy occupied all "three key management personnel [(KMP)] slots": "the senior management official [(SMO)], the facility security officer [(FSO)], and the insider threat personnel security officer [(ITPSO)]." (Dkt. 78 at 194; *see id.* at 244

("McElroy's clearance is tied to the facility clearance in probably a way that I have not seen before in any capacity where he fills all three primary key management roles—the [SMO], [FSO], and [ITPSO].").) Klem indicated that this organization was significant because FSOs and ITPSOs "need to be consistently and continuously cleared at the level of the facility." (*Id.* at 195.) If a facility's FSO or ITPSO lost his clearance, Klem testified, the facility's clearance would also be revoked. (*Id.* at 196.) He testified that it was his understanding that this outcome was mandated by the NISPOM, (Dkt. 78 at 195), which provides that, while certain employees "may be temporarily excluded from access to classified information" pending a determination as to their clearance status, this temporary permissive exclusion does not apply where the employee is the facility's FSO or ITPSO, 32 C.F.R. § 117.9(g).[2] Similarly, Plaintiff's witness Joseph Jessop, a private facility security officer who works with Plaintiff, explained that a facility's clearance "is always based on the key management personnel's clearance," which, in this case, was McElroy alone. (Dkt. 78 at 4, 11.)

Klem testified that Goodwin contacted him in July 2022 and informed him that McElroy's security clearance had been denied. (*Id.* at 193.) He testified that he memorialized the information he had received from Goodwin in an email to William Garofalo, Defendant's program manager. (*Id.* at 193–95.) That email, sent July 13, 2022, stated that Plaintiff's "FSO/KMP Brian McElroy had his personnel security clearance revoked, which resulted in the loss of [Plaintiff's] [f]acility [c]learance."

---

[2] *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . .").

(Dkt. 76-5 at 2.) Goodwin replied to that email chain the following morning, stating that Plaintiff "[wa]s no longer a cleared facility." (*Id.* at 1–2.) Garofalo stated that McElroy would therefore need to be "debrief[ed]," (*id.* at 1), which refers to the formal removal of access, (Dkt. 78 at 196).

Defendant immediately issued Plaintiff a stop work order pursuant to the subcontract's security requirements, citing FAR 52.204-2. (Dkt. 76-10 at 10; *see* Dkt. 76-1 at 34.) On July 22, 2022, McElroy emailed Defendant indicating that his top secret clearance "ha[d] been reinstated" on July 21, 2022, and that Plaintiff's facility clearance had always been active. (Dkt. 76-3 at 1.) Garofalo asked Klem to verify this information, but Klem stated that while Plaintiff's facility clearance appeared to be "good," he could not verify McElroy's clearance status. (*Id.*; Dkt. 76-28 at 1.) Klem testified that the process of requesting and receiving security clearance authorization for facilities and individuals is a complicated process involving multiple points of contact between Plaintiff, Defendant, and the government. (*See* Dkt. 78 at 186–87, 189.) This process is further complicated by the government's practice of maintaining discrete systems for monitoring security clearance authorizations, including the Defense Information System for Security (DISS) and the National Industrial Security System (NISS). (*Id.* at 189–90.) Thus, while Klem was able to check NISS and verify that there was "no clearance issue" reported with Plaintiff's facility clearance, he was not able to verify McElroy's clearance status in DISS. (Dkt. 78 at 207–08; *see* Dkt. 76-28 at 1.) Consequently, Klem could not verify Plaintiff's clearance status because, as he testified, "[t]here is a significant lag in reporting on the government side when it

comes to . . . updating various databases." (Dkt. 78 at 207–08.) Jessop likewise testified that the connection "between NISS and DISS breaks continuously," such that NISS might erroneously indicate that a facility was cleared when it was not. (*Id.* at 23 ("[NISS] might show that the company has a top secret facility clearance when, in fact, they do[ not], or it may say they do[ not] have a facility clearance when, in fact, they do.").) Accordingly, as far as Klem could tell, McElroy's clearance, to which Plaintiff's facility clearance was tied, could well have been revoked, rendering both Plaintiff and McElroy uncleared—in accord with the information Klem had received from Goodwin. (*Id.* at 205–06.) For these reasons, and given Goodwin's role as the C5ISR security officer, Defendant relied on her representation that Plaintiff and McElroy were no longer cleared and thus were not able to perform under the contract. (Dkt. 76-5 at 1–3; Dkt. 78 at 201–04.) Accordingly, on July 27, 2022, Defendants sent Plaintiff a formal termination notice, which indicated that the termination was being made pursuant to the termination for convenience clause of the subcontract "based upon customer direction." (Dkt. 76-2 at 1.)[3]

While Jessop testified that he was not aware of any issues regarding either Plaintiff's or McElroy's security clearance, (Dkt. 78 at 28–29), McElroy himself testified that his SCI access had been revoked due to an issue regarding his taxes, (*id.*

---

[3] The subcontract stated that "[a]ll contractual communications" regarding the subcontract "shall be transmitted through [Defendant]'s designated [s]ubcontracts [r]epresentative," Gabriela Conway-Wolf. (Dkt. 76-1 at 8.) However, the stop work order and the termination notice were both sent by Ergyseda Barr, (*see* Dkt. 76-2 at 1–2; Dkt. 76-9 at 1), who had become Defendant's representative at some point after the subcontract's execution, (Dkt. 77 at 98).

at 121 ("Q: Mr. McElroy, you don't dispute that your SCI access was revoked? A: No. Q: And the reason that was revoked was because of an [Internal Revenue Service (IRS)] tax issue that you personally have? A: Correct.")). Indeed, McElroy testified that he has not yet reapplied for SCI access and so "the current status is revoked." (*Id.* at 122.) Several emails were introduced at trial between McElroy and Patrick Arnold, one of the government's industrial security specialists, indicating that the Department of Defense's Central Adjudication Facility (DOD CAF) had revoked Plaintiff's security clearance, and Plaintiff was in the process of appealing the revocation. (*See* Dkts. 76-30, 76-31, 76-32, 76-33, 76-34, 76-35, 76-36, 76-37; *see also* Dkt. 78 at 146–49.)

In sum, based on Goodwin's email, Defendant determined that McElroy had lost the security clearance required to work on the project, and thus, Plaintiff was no longer a cleared facility and needed to be terminated. (*See* Dkt. 78 at 243 ("Based on the information that we received from . . . Goodwin and our government customer, . . . McElroy no longer had a security clearance and was required to be debriefed[ and to] surrender his facility badge and his common access card."); *id.* at 244 ("The fact that [McElroy's] clearance was solely tied to each one of those positions put his facility clearance in an immediate invalidation or revocation portion, with the loss of that clearance being so directly tied to the facility clearance.").) Furstoss testified that Defendant did not replace Plaintiff after terminating the subcontract because Defendant determined that no replacement was necessary. (Dkt. 77 at 107–08.)

## CONCLUSIONS OF LAW

Pursuant to the choice of law provision in the contract, the law of Virginia governs disputes under the contract, which the parties do not dispute. (Dkt. 1-1 at 19; *see* Dkt. 68 at 3, 5, 15–16, 19–20; Dkt. 70 at 4–9.)  To establish a breach of contract claim under Virginia law, a plaintiff must show (1) "a legally enforceable obligation of a defendant to a plaintiff," (2) "the defendant's violation or breach of that obligation," and (3) "injury or damage to the plaintiff caused by the breach of obligation." *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016) (quotation omitted); *accord Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 846 (11th Cir. 2017).  The plaintiff bears the burden of establishing all three elements by a preponderance of the evidence.  *See Cent. Tel. Co. of Va. v. Sprint Commc'ns Co. of Va.*, 715 F.3d 501, 517 (4th Cir. 2013) (applying Virginia law).  The court must "consider the contract as a whole and . . . not place emphasis on isolated terms." *Quadros & Assocs., P.C. v. City of Hampton*, 597 S.E.2d 90, 93 (Va. 2004); *accord TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1329 (11th Cir. 2020).  "The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Bolton v. McKinney*, 855 S.E.2d 853, 855 (Va. 2021) (quotation omitted).  Because the court determines that Plaintiff failed to satisfy its burden to show Defendant breached the subcontract, the court does not reach the issue of damages.

The subcontract unambiguously stated that Defendant could terminate the subcontract for convenience if it was "determined that a termination [wa]s in [Defendant]'s and/or the [g]overnment's best interests." (Dkt. 76-1 at 14.) "Where, as here, the terms of an agreement are clear and unambiguous, the language used will be taken in its ordinary signification, and the plain meaning will be ascribed to it." *Marriott Corp. v. Combined Props. Ltd. P'ship*, 391 S.E.2d 313, 316 (Va. 1990). The court determines that Defendant properly terminated the contract pursuant to the termination for convenience provision because it was informed by its government contact at C5ISR that McElroy had lost the security clearance required to perform under the contract and that Plaintiff was therefore no longer a cleared facility. (Dkt. 76-5; Dkt. 78 at 193–95.) *See W.C. English, Inc. v. Commonwealth, Dep't of Transp.*, 420 S.E.2d 252, 253–55 (Va. Ct. App. 1992) (determining that a contract was properly terminated where the contract authorized termination "for conditions beyond [the defendant]'s control which would prevent the [defendant] from continuing with the [c]ontract" and where performance of the contract had become cost-prohibitive). The termination provision at issue in this case is a broad one, investing Defendant with significant discretion, but "courts will not set aside a contractual provision simply because it constitutes a hard bargain." *Culpeper Reg'l Hosp. v. Jones*, 767 S.E.2d 236, 240 (Va. Ct. App. 2015) (internal quotation marks omitted) (quoting *Payne v. Simmons*, 350 S.E.2d 637, 640 (Va. 1986)).

Plaintiff's position is that Defendant had a duty to independently verify the status of Plaintiff's and McElroy's security clearances. (*See* Dkt. 88 at 6.) This

argument presupposes that, contrary to Goodwin's assertion, Plaintiff's facility clearance was active. Based on the evidence adduced at trial, the court does not find that Plaintiff's facility clearance was active. Even if Plaintiff's clearance was, in fact, never revoked, Furstoss credibly testified that Defendant had no other "mechanism to rely on" regarding the status of Plaintiff's security clearance "than the C5ISR security office." (Dkt. 77 at 87; *see id.* at 87–88 ("If Jean Goodwin states that somebody's uncleared, we, as [Defendant], have to take that . . . at face value . . . . There is no way to verify accuracy . . . .").) Klem corroborated that Defendant was not able to definitively verify security clearances and had to rely on Goodwin's representations. (*See* Dkt. 78 at 193–206.) Given Goodwin's position as the C5ISR security officer, the court concludes that Defendant reasonably relied on her representation that Plaintiff could not continue to perform under the subcontract because McElroy had lost his security clearance. The court also takes notice of Defendant's argument that Goodwin, as a government official, presumptively acted in good faith in the discharge of her duties. (*See* Dkt. 85 at 19.) *See Gaskins v. United States*, 227 Ct. Cl. 563, 566 (1981) ("The presumption is that government officials have acted in good faith in making their decisions. It takes almost irrefragable proof to overcome the presumption. The burden of doing so is on [the] plaintiff.").

    Plaintiff emphasizes the importance of the Single/Sole Source Justification document Defendant submitted to the government when it selected Plaintiff to perform under the prime contract. (*See* Dkt. 88 at 3.) The thrust of Plaintiff's argument is that, given Plaintiff's abilities as underscored by Defendant in that document,

terminating the subcontract could not have been in the best interests of the government. (*See id.*) Furstoss credibly testified at trial, however, that the revocation of Plaintiff's security clearance was an overriding concern that mandated Defendant's termination of the subcontract. (Dkt. 77 at 107.) *Cf. Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980) ("The [g]overnment has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."); *Salinas-Nix v. Dep't of the Army*, 527 F. App'x 956, 961 (Fed. Cir. 2013) (agreeing with the government's argument that it had a "compelling interest in withholding national security information from unauthorized persons"). Moreover, Furstoss testified that while Plaintiff's involvement was critical at the time the subcontract was executed, it was no longer necessary to continue performing under the prime contract at the time of termination, more than a year later. (Dkt. 77 at 107–08.) Indeed, he testified that Defendant decided not to hire an additional subcontractor after terminating Plaintiff because Defendant "did not need to backfill [Plaintiff's position] to get the mission done." (*Id.*)

Plaintiff also appears to argue that the stop work order and notice of termination were improperly communicated to it because they were not sent by Gabriela Conway-Wolf, (Dkt. 88 at 7–8), who was Defendant's designated subcontracts representative under the subcontract, (Dkt. 76-1 at 8). These documents were instead sent by Ergyseda Barr, who had become Defendant's subcontracts representative after the contract was executed. (Dkt. 77 at 98.) Plaintiff's argument is unavailing for three

reasons. First, Plaintiff's breach allegation in the complaint is premised only on Defendant's purportedly terminating the subcontract "without a proper basis"—not on, as it now argues, improper transmission of the termination documents. (Dkt. 1 at 3.) Second, even if improper transmission were properly alleged, that Barr sent the stop work order and notice of termination is immaterial. *See Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997) ("A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract."). Third, the fact that Barr sent the termination documents does not appear to violate the terms of the subcontract. The relevant provision states that "[a]ll contractual communications . . . shall be transmitted through [Defendant]'s designated [s]ubcontracts [r]epresentative," who was separately stated to be Conway-Wolf. (Dkt. 76-1 at 8.) However, Furstoss testified that Barr replaced Conway-Wolf as the subcontracts representative after the subcontract was executed, (Dkt. 77 at 98), and Plaintiff has not pointed to a provision of the subcontract preventing Defendant from doing so, (*see* Dkt. 88.)

Accordingly, Plaintiff has failed to satisfy its burden to prove by a preponderance of the evidence that Defendant breached the subcontract. *See Sprint Commc'ns*, 715 F.3d at 517.

## CONCLUSION

Based on the above findings of fact and conclusions of law, the Clerk is **DIRECTED** to enter judgment in favor of Defendant, to terminate all pending motions and deadlines, and to close this case.

**ORDERED** in Orlando, Florida, on July 3, 2025.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record